Filed 5/16/22  P. v. Maljanian CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076461 |
| v. | (Super.Ct.No. 16CR057094) |
| JAMES EDWARD MALJANIAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Bridgid M. McCann, Judge.  Affirmed as modified.

James Edward Maljanian, in pro. per.; Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charlese C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

1

**FACTUAL AND PROCEDURAL HISTORY**

A.    PROCEDURAL HISTORY

On January 29, 2019, a first amended information charged defendant and appellant James Edward Maljanian with one count of car theft under Vehicle Code section 10851, subdivision (a) (count 1).  After a jury trial, on February 6, 2019, defendant was found guilty of car theft.

On July 30, 2019, the trial court sentenced defendant to the upper term of three years and suspended the sentence upon successful completion of probation.  The court imposed numerous conditions, including 365 days in jail, where defendant was eligible for the county jail weekend/work release program.  The court also imposed (1) a $300 restitution fine under Penal Code[1] section 1202.4; (2) a $300 fine, suspended unless probation is revoked, under Penal Code section 1202.45; (3) a $40 court operations fee under Penal Code section 1465.8; and (4) a $30 conviction fee under Government Code section 70373.  The court also ordered defendant to pay $727 for a presentence report, and $29 a month for mandatory supervision.[2]  Thereafter, the trial court granted

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] In footnote 3of his opening brief, defendant contends that section 1465.9, as amended on July 1, 2021, renders the presentence report fee under section 1203.1b and the mandatory supervision fee under section 1203.1b unenforceable.  We agree. However, in the appeal from defendant's underlying case we already modified the judgment "to strike the $727 presentencing report fee and the $29 a month probation supervision fee."  (*People v. Maljanian* (Sept. 10, 2021, E073573) [nonpub. opn.]), 2021 WL 4129476, at *10, as modified on denial of reh'g (Oct. 7, 2021), review filed (Nov. 5, 2021).)

defendant seven days of actual credit and "any conduct credit," and ordered him to report to the Glen Helen Rehabilitation Center by August 16, 2019.

On September 27, 2019, after a hearing, the trial court ordered restitution of $6,000 to the victim with a 15 percent administrative fee, and payments of $30 every month starting October 30, 2019. After defendant appealed, on September 19, 2021, we affirmed defendant's conviction in *People v. Maljanian*, *supra*, E073573.

On January 31, 2020, the trial court denied defendant's motion under *People v. Marsden* (1970) 2 Cal.3rd 118 (*Marsden*) and *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). On February 14, 2020, the court denied a hearing on defendant's *Marsden* motion.

On February 20, 2020, the probation department filed a petition to revoke defendant's probation. The petition alleged that defendant had failed to cooperate with probation by not allowing visits and searches, by failing to submit to GPS monitoring, by having no contact with the DMV, and by failing to report to probation.

On September 4, 2020, conflict panel counsel was relieved as defendant's counsel and private counsel, James Glick, appeared for defendant.

On October 9, 2020, the court ordered defendant to provide his last tax return, a bank statement to assist in completing an assets form, and proof that defendant had applied for a job every day between that day through November 6, 2020.

On November 6, 2020, the trial court granted defense counsel, Glick, leave to withdraw as counsel. Defendant explained that he had not filed a tax return in the past three years and did not have any bank accounts. Defendant, however, stated that he had

3

job applications. The court ordered defendant to obtain documents or statements from people who supported him or allowed him to stay rent-free in order for defendant to fill out the asset form.

On November 24, 2020, the trial court stated that it was unacceptable that there were eight months when defendant had no supervision and had stopped attending his weekend work/release program, perhaps related to COVID. And, as of November 18, defendant was "not even trying to remain in substantial compliance." If defendant agreed to admit to a violation of probation, the court offered to reinstate defendant on the original terms with the understanding that defendant would comply with all terms, including GPS monitoring. The court stated that defendant had the choice between admitting the violation or "he is in prison" after a hearing. The court was not going to negotiate.

At the hearing, the court denied defendant's request to have his GPS taken off. The court stated that it was not imposing additional penalties and would simply reinstate defendant on probation. Defendant stated that he did not believe he was in violation of his probation, but was concerned about what would happen at a hearing, so he admitted violating probation.

Thereafter, the trial court reinstated defendant's probation, as promised, but extended it to November 24, 2022. The court eventually awarded defendant 119 actual days. Moreover, the court stated that defendant was required to complete the probation condition of serving 365 days in jail on work release.

The court denied defendant's request to grant custody credit for time spent on GPS, unless the jail decided to give him credit. Additionally, the court ordered defendant to provide proof of where and how he was living and eating, and to provide at least 10 job applications—requesting less than $25 per hour—on December 11, 2020.

On December 11, 2020, the trial court declined to find that defendant violated probation again. Defendant provided some documents about his income, but the court stated that defendant had still failed to provide "sufficient information to understand that [defendant] has no income to be able to pay restitution." Thereafter the court modified the restitution order to require defendant to pay $100 per month, instead of $30 per month, starting February 9, 2021. The court did "not believe that that's an inappropriate amount to order." The court stated that defendant could ask for a hearing on the matter if he could provide information to modify that amount, or he could appeal. The court stated that defendant was required to show "proof of income and expenditures. That includes exactly how much you get every month and how much you pay out every month, for what and for what you get."

On January 7, 2021, the trial court declined to alter defendant's terms of probation, except the court ordered that defendant was no longer responsible for the cost of GPS monitoring. The court again tentatively denied defendant's request to award him custody credit for the time spent on GPS. The court reserved that issue until the next hearing to find out whether probation or the sheriff's department had ordered defendant to wear a GPS ankle-monitor bracelet.

Moreover, the trial court denied defendant's request to modify several other conditions of probation, including no contact with the police, the DMV, or the victim; offsetting the restitution amount owed to the victim with money the victim owed defendant; a finding of indigency with respect to the fees associated with the weekend work/release program; and for a one-week extension to report to work/release. The court explained that these conditions did not prevent defendant from suing the victim.

At the January 7, 2021, hearing defendant complained that the court improperly extended probation to two years, until November 22, 2022. The court ordered a transcript to review the matter.

On January 25, 2021, defendant filed a notice of appeal challenging the modifications to probation and the validity of his plea. With respect to defendant's plea of violating his probation, the trial court denied his request for a certificate of probable cause.

On February 11, 2021, defendant withdrew his *Marsden* and *Faretta* motions. The court denied defendant's request for custody credit for time spent on GPS. The court also ordered defendant's GPS monitor to be removed.

On February 25, 2021, the trial court denied defendant's *Faretta* motion because the form did not indicate that defendant could follow instructions or that his waiver was voluntary. The court also denied defendant's *Marsden* motion after a hearing.

The court stated defendant could have understood that he was admitting a probation violation predicated on the idea that his probation was not going to be

extended. The court, therefore, offered defendant a chance to withdraw his plea. Defendant declined the offer.

Thereafter, the trial court acknowledged that the new law limited defendant's probation term to two years, but ruled that the law did not conflict with the court extending defendant's probation for two years after he admitted to a probation violation. The court again declined to change any probation terms.

That same day, February 25, 2021, defendant filed another notice of appeal challenging the court orders of that date and February 11, 2021. The trial court consolidated this appeal with the previous appeal filed on January 25, 2021, and ordered additional transcripts to be prepared.

B.    FACTUAL HISTORY

The statement of facts is taken from our unpublished opinion:

"The victim collects classic cars and sells classic car parts on the internet; he is not a professional car dealer. In 2011, the victim purchased three vehicles from Daniel Shimiaei. One of the vehicles was a 1969 Jaguar XKE (the Jaguar). The victim estimated the Jaguar was worth $12,000 to $25,000. The victim stored the Jaguar in a hangar at the El Monte airport. The victim knew defendant because defendant was also a tenant at the El Monte airport.

"On August 29, 2011, the victim borrowed $25,000 from defendant. The written terms of the loan required the victim to pay defendant a fee of $1,950 and for the loan to be repaid by September 28, 2011. The writing also reflected the loan was secured by

7

titles to two Jaguars. In the writing, no identifying information was given for the Jaguars, such as models or license plate numbers.

"By the end of September 2011, the victim had failed to repay the loan. On November 3, 2011, the victim and defendant agreed to extend the loan to November 27, 2011. The written extension agreement reflects a change of one of the two Jaguar titles, from a '72 coupe v12' to a '69 conv. Jag,' i.e., the Jaguar. The title that the victim gave to defendant for the Jaguar was unsigned. Shimiaei initially forgot to sign the title when he sold the Jaguar to the victim, which temporarily left the victim with an unsigned title. On October 28, 2011, Shimiaei signed the title for the Jaguar. The victim did not register the Jaguar in his name because he planned to use the Jaguar for parts. The title for the Jaguar that the victim gave to defendant, on November 3, 2011, was the unsigned title from Shimiaei; however, by that date, Shimiaei had already signed the title. Thus, there were two separate versions of the title in existence at the same time—one that was signed by Shimiaei, and one that was unsigned. Defendant held the version from Shimiaei that was unsigned. The victim gave defendant an unsigned car title to show good faith, not to allow defendant to register the Jaguar in defendant's name.

"The victim failed to repay the entire loan balance by November 27, 2011, but continued making payments to defendant in 2012. On January 9, 2013, defendant and the victim entered into a third written agreement (the 2013 agreement), which reflected the victim had repaid defendant $21,900 and that the victim would pay defendant more interest. Another term of the 2013 agreement read, '3) Final payment of $1000 to be done by February-27-2013. [¶] Title for [the Jaguar] transfer at time of final monies

8

paid, realeasing [*sic*] liability from [defendant].'  The victim was unhappy with the terms of the 2013 agreement.  However, the victim signed the 2013 agreement because it is 'very hard to deal with [defendant] and his way of doing business.  [Defendant] just has an approach that left [the victim] against the ball.'  The victim signed the 2013 agreement 'under a lot of stress and duress.'

"On January 22, 2013, the victim paid defendant another $1,000, for a total repayment of $22,900; and that was the last payment the victim gave to defendant, which meant the principal and interest were not fully repaid. The victim never told defendant he could have the Jaguar.  The victim explained, 'It would be ludicrous to give him a car when I had already paid $24,000 [*sic*].'

"Defendant told Shimiaei that the victim owed defendant money.  Defendant contacted Shimiaei more than 10 times with 'lots of late evening phone calls,' asking Shimiaei to author a document reflecting defendant owned the Jaguar.  Shimiaei said he 'would not do that because that was not the case and that would be illegal.'  Defendant threatened to tell various law enforcement agencies that Shimiaei was 'involved with dealing with stolen cars or cars that were in bad transactions.'  Shimiaei 'eventually started getting calls from various different departments of law enforcement regarding this.'

"Defendant summoned the police to one of the victim's hangars at the El Monte airport.  On May 14, 2013, the police arrived 'in full swat outfits with their guns drawn, storming the place.'  The police asked the victim for the titles to the vehicles in the hangar.  The Jaguar was not one of the vehicles the police asked about; the Jaguar was in

9

a different hangar at the airport.  Approximately one month later, the victim contacted the police 'regarding the accusation of [defendant] regarding the Jaguar.'  The victim showed the police his purchase agreement, his loan agreement with defendant, and evidence that the victim had repaid '90 percent of the loan.'  The victim agreed to show the police the Jaguar and have the VIN verified.  The police came to the victim's hangar three or four more times to investigate the Jaguar; the time period for those visits is unclear.

"In 2015, the victim rented 40-foot shipping containers at a storage facility in Chino from Merlin Smit.  The Jaguar was placed in one of the shipping containers.  On February 21, 2016, defendant called Smit.  Defendant told Smit that defendant's Jaguar was in one of the victim's shipping containers and asked Smit to help defendant 'get his car out of there.'  Smit agreed to meet defendant at the storage facility to help defendant remove the Jaguar.  That same day, Smit met defendant at the storage facility.  The victim had left one or two of the doors to the shipping container unlocked.  Smit opened the container, defendant identified the Jaguar, and Smit helped defendant push the Jaguar out of the shipping container.  Smit towed the Jaguar just outside the storage facility gate.

"Defendant called Joe Young and asked Young to tow the Jaguar because it was not drivable.  At approximately midnight, Young met defendant at the Chino storage facility.  Young towed the Jaguar to one of Young's storage spaces in Pasadena.  Defendant told Young that defendant owned the Jaguar.  On February 22, 2016, the victim reported the Jaguar stolen.

"Young tried to help defendant sell the Jaguar.  Young contacted Jon Pollock, who specialized in classic Jaguars.  Within a week of the Jaguar being towed to Pasadena,

10

Pollock came to look at the Jaguar. Prior to Pollock's arrival, defendant removed the VIN tag from the Jaguar. The VIN tag had been located under the hood, on the passenger side, on the bottom rail. It is not typical to remove a VIN tag when selling a car. A classic car has more value when the VIN tag is attached because, when it is not attached, there is an implication that the vehicle is stolen. Young asked defendant why he removed the VIN tag. Defendant replied, 'Because there was problems with the title.' Pollock was considering purchasing the Jaguar. After looking at the Jaguar, Pollock asked defendant for the VIN tag. Defendant told Pollock, 'That doesn't come with the car.'

"In August 2016, a friend of Young and defendant 'ran the VIN tag for [defendant].' At that point, Young contacted law enforcement and said Young was in possession of a stolen vehicle. Young spoke to Chino Police Detective Girasek. Young met Girasek at the storage facility. Girasek needed to identify the Jaguar but was unable to locate a VIN tag on the Jaguar. Young called Pollock who explained where a hidden VIN could be found on the Jaguar. Girasek found the hidden VIN and contacted the victim, who retrieved the Jaguar.

"Luis Hernandez was an investigator for the DMV. Hernandez explained that a lien can be filed against a vehicle. The lien is filed with the DMV and provides notice that the vehicle will be sold if the money owed is not paid. Hernandez further explained that a vehicle can be transferred from one person to another by the prior owner of the vehicle either signing title over to the new owner, or, if the title is lost, by signing an 'application for title with a transfer. But in all cases, they have to sign off the vehicle.' Signing off means signing 'a document under penalty of perjury indicating that they are

11

releasing their interest in the vehicle, and they're intending to transfer it to the new owner.'

"When there is a dispute over vehicle ownership, the DMV will 'advise the parties to go to civil court, [and] have a judge rule on who should be awarded the vehicle. Once that judgment is given, the certified judgment would then be sent to the [DMV's] Involuntary Transfer Section . . . and then revert the title to reflect what the order of the Court was.' " (*People v. Maljanian*, *supra*, E073573, at *1-3.)

## DISCUSSION

### A.    *WENDE* APPEAL

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel initially filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and requested this court to undertake a review of the entire record. Pursuant to *Anders*, counsel identified the following issues to assist the court in its search of the record for error:

"A.    Did The Court Properly Extend [defendant]'s Probation For Two Years After He Admitted To A Violation Of Probation[?]"[3]

"B.    Did The Court Properly Deny [defendant]'s *Marsden* and *Faretta* Motions?"

---

[3] We asked for additional briefing on this issue and will address it *post*.

12

"C.     Was [defendant] Properly Advised When He Waived A Hearing Under *People v. Vickers* (1972) 8 Cal.3rd 451?"

"D.     Were There Sufficient Changed Circumstances To Justify Increasing [defendant]'s Restitution Payment From $30 Monthly To $100 Monthly[?]"

We offered defendant an opportunity to file a personal supplemental brief.  On October 21, 2021, defendant filed a 28-page typewritten supplemental brief, and on October 28, 2021, defendant filed a one-page letter "clarification of Wende."  In defendant's supplement brief, defendant appears to be arguing that his underlying conviction should be reversed.  For example, defendant argues that "there is a witness to the signing of the Contract #3 that was not able to testify during the trial because he was hospitalized for 4 months; but he is still willing to testify today.  The best option would be to dismiss the whole case . . . in recognition that Justice was Miscarried in the False charges; or to allow a Retrial to correct the lies in the marred-trial that was rushed through with Evidence blocked."  Defendant then goes on to provide, in detail, the alleged facts of the underlying case.  However, as discussed *ante*, defendant already appealed from the underlying conviction of vehicle theft.  And on September 10, 2021, this court issued an unpublished opinion in *People v. Maljanian*, *supra*, E073573, wherein we affirmed the conviction.

In his supplemental brief, defendant also appears to argue that the trial court erred in awarding monthly payments "when there is much proof of ZERO income, due precisely because of this unjust prosecution."  As provided *ante*, however, the trial court generously gave defendant numerous opportunities to provide the court with his

13

accounting—on how much he earned, his expenses, or statements from friends and/or family members indicating that they were providing monetary support and/or shelter to defendant. When defendant failed to provide any documentation, the trial court properly increased defendant's monthly payments. The court did provide defendant with an opportunity to reduce the payments if he could provide the court with proper documentation.

Additionally, it appears that defendant is challenging the length of his probation after he admitted to violating his probation. We will address this issue *post*.

Even if defendant's arguments have merit, defendant waived this issue because when the court offered defendant a chance to withdraw his plea, defendant declined the offer.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error and find no error, except as discussed *post*.

## B. ADDITIONAL ISSUES ON APPEAL

After reviewing the *Wende* brief, defendant's personal brief, and the record, we found two potential issues we deemed may be arguable as error. Therefore, on January 12, 2022, on our own motion, we vacated the submission of this matter and asked for briefing as follows:

"Appellant's counsel has filed a brief under authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 [87 S.Ct. 1396, 18 L.Ed.2d 493], asking this court to undertake a review of the entire record. We have undertaken

14

this examination and now request the parties to brief the following issues: (1) Under Assembly Bill No. 1950, effective January 1, 2021 (Stats. 2020, ch. 328, § 2), did the trial court properly extend defendant's probation for two years after defendant admitted to a probation violation? (2) Under new Penal Code section 1465.9, should the following be vacated: presentence report fees under Penal Code section 1203.1b; mandatory supervision fees under Penal Code section 1203.1b; fees processing arrests and citations under Government Code sections 29550.1, 20550.2, and 29550.3; fees administering home detention programs under Penal Code section 1203.016; electronic monitoring program fees under Penal Code sections 1203.018, 1201.15, and 3010.8; work furlough program fees under Penal Code section 6266; and work release program fees under Penal Code section 4024.2?"

The parties complied with our order by filing supplemental briefs.

### 1. *ASSEMBLY BILL NO. 1950 (AB 1950)*

Defendant contends that "under Assembly Bill 1950, the trial court erred by extending [defendant]'s probation for two years from the time he admitted to a probation violation, rather than tolling the time his probation was revoked." We agree with defendant.

In this case, on July 30, 2019, the trial court sentenced defendant to the upper term of three years and suspended the sentence upon successful of probation. Therefore, defendant's three-year probationary period would have ended on July 29, 2022.

15

However, prior to the end of defendant's probation, on February 20, 2020, the probation department filed a petition to revoke defendant's probation and as of that date, the trial court revoked defendant's probation.

On November 24, 2020, defendant admitted to violating probation, and the trial court reinstated probation as promised, but extended defendant's probationary period by two years from that date, not when probation was initially ordered, to November 24, 2022.

As such, defendant contends that the maximum the court had authority to extend defendant's probation was for two years from July 30, 2019, which is July 29, 2021, plus 278 days when defendant's probation was revoked.[4]  Therefore, in the absence of another probation violation, defendant's probation should terminate on May 3, 2022, not November 24, 2022.

AB 1950 amended section 1203.1, subdivision (a).  It now provides that the court "in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding two years, and upon those terms and conditions as it shall determine." (§ 1203.1, subd. (a).)

"Multiple courts have considered whether the amendments of Assembly Bill 1950 apply retroactively to the benefit of a person whose judgment is not yet final on appeal,

---

[4]  We take judicial notice that there are 278 days between February 20, 2020 (the date that defendant's probation was revoked) and November 24, 2020 (the day when defendant's probation was reinstated).  (Evid. Code, § 451, subd. (f).)

and they have uniformly held that they do." (*Kuhnel v. Appellate Division of Superior Court* (2022) 75 Cal.App.5th 726, 732 (*Kuhnel*), italics omitted.) "As [*People v. Quinn* (2021) 59 Cal.App.5th 874 (*Quinn*)] recently explained, although statutes are generally presumed to apply prospectively, the Legislature may ' " 'enact laws that apply retroactively, either explicitly or by implication,' " ' and ' "amendatory statutes that lessen the punishment for criminal conduct are ordinarily intended to apply retroactively." ' [Citation.] This is because '[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper.' " [Citation.] After such a legislative determination, ' "it is safe to assume . . . that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts." ' " (*Id.* at p. 732.)

"The court in *Quinn* concluded the amendments of Assembly Bill 1950 fell within this rule, rejecting the argument that the *Estrada*[5] presumption of retroactivity did not apply because probation is not a form of criminal punishment. [Citation.] *Quinn* followed *People v. Burton* (2020) 58 Cal.App.5th Supp. 1, . . . an opinion of the Los Angeles County appellate division that applied Assembly Bill 1950 retroactively. [Citation.] As explained in *Burton*, '[t]he longer the length of probation, the greater the encroachment on a probationer's interest in living free from government intrusion,'

---

[5] *In re Estrada* (1965) 63 Cal.2d 740.

17

whether that intrusion takes the form of probation conditions or a risk of further incarceration." (*Kuhnel*, *supra*, 75 Cal.App.5th at p. 732.)

"Every appellate case to have considered the retroactivity of Assembly Bill 1950 has agreed with *Quinn*, and the People do not disagree with their conclusions." (*Kuhnel*, *supra*, 75 Cal.App.5th at p. 733.)

Because AB 1950 is retroactive, defendant argues that his "probationary term should have been reduced to two years, and thus, should have ended on July 29, 2021, absent the time his probation was revoked. Thus, the court erred by extending [defendant's] probation by two years after he admitted a violation of probation." Defendant argues that under AB 1950, "the court was empowered to extend [defendant's] probation beyond two years *only* for the time that his probation was suspended."

Although the People agree that AB 1950 applies retroactively, the People argue that "[t]he distinction with appellant's case, however, is that his grant of probation was revoked and reinstated before the effective date of AB 1950. AB 1950 is silent on how to implement its reduction of the term of probation when a defendant's probation was revoked prior to January 1, 2021. (Compare *Quinn*, *supra*, 59 Cal.App.5th at pp. 857 [applying AB 1950 to the originally imposed three-year term of probation, as opposed to a term following revocation of probation.)" The People argue that defendant's "admission that he violated the terms and conditions of probation permitted the court to reinstate probation for a two-year term." In support of their argument, the People simply cite to a single case, *People v. Sem* (2014) 229 Cal.App.4th 1176, 1191-1192 (*Sem*). The People's reliance on *Sem*, however, is misplaced.

In *Sem*, the issue was "how long a term of probation can be extended to compel payment of victim restitution from a probationer who was unable to pay $60,422 in full during her original three-year term of probation." (*Sem*, *supra*, 229 Cal.App.4th at p. 1179.) There, the court noted that "[i]t is well settled that the payment of restitution to a crime victim may be ordered as a condition of probation. [Citations.] Based on an alleged probation violation, the trial court may summarily revoke probation in order to preserve its jurisdiction pending a formal revocation hearing. [Citations.] When a probation violation is established, the court may modify, revoke, terminate, or reinstate probation. [Citations.] Felony probation may last up to the maximum possible sentence, except that where the maximum sentence is five years or less, probation may extend up to five years. [Citation.] [¶] . . . 'However, probation shall not be revoked for failure of a person to make restitution pursuant to Section 1203.04 as a condition of probation unless the court determines that the defendant has willfully failed to pay and has the ability to pay. Restitution shall be consistent with the person's ability to pay.' " (*Id.* at p. 1189.)

The *Sem* court noted that "[b]ased on an admission that defendant had willfully failed to pay restitution, the trial court could have revoked probation and, as an alternative to sentencing defendant to prison, could have reinstated probation 'for that period and with those terms and conditions as it could have done immediately following conviction.' " (*Sem*, *supra*, 229 Cal.App.4th at p. 1191.) However, instead of exercising its statutory options, the appellate court noted that "[t]he superior court here has created a status of perpetual revocation in which a probationer remains obligated to comply with a probation condition requiring payment of restitution (and other probation conditions) for

19

a substantial time after the maximum probationary period. The practical effect of this status is a reinstatement of probation on the same terms for an indefinite period." (*Id.* at pp. 1192-1193.)

The appellate court then agreed with the People "that the summary revocation tolled the probationary period for five months and three days until defendant appeared at the revocation hearing," the court, however, rejected "the suggestion that formal revocation further tolled the probationary period. At that time, with defendant before the court, the court was obliged to either reinstate probation or sentence defendant to prison. It was not authorized to postpone its disposition and thereby impose a de facto reinstatement of probation on the same terms for a period exceeding the statutory maximum of five years." (*Sem*, *supra*, 229 Cal.App.4th at p. 1193.)

Although the People cited *Sem* to support its argument as to why AB 1950 "does not reach back in time to invalidate the court's actions in any way," we disagree. *Sem*'s narrow holding does not apply to this case. Moreover, the *Sem* court even noted that "[b]ased on an admission that defendant had willfully failed to pay restitution, the trial court could have revoked probation and, as an alternative to sentencing defendant to prison, could have reinstated probation 'for that period and with those terms and conditions *as it could have done immediately following conviction*.' " (*Sem*, *supra*, 229 Cal.App.4th at p. 1191, italics added.)

Here, because AB 1950 is retroactive, the trial court was permitted to reinstate probation for only two years (the maximum under the newly revised statute) from the

20

time of defendant's conviction, not from the time of reinstatement of probation. Our holding is supported by AB 1950's legislative history, as discussed by the court in *Quinn*:

"*Quinn* also discussed the legislative history of Assembly Bill 1950, which reflects 'the Legislature's concern . . . that lengthy probationary periods do not serve a rehabilitative function and unfairly lead to reincarceration for technical violations.' [Citation.] For instance, the author's statement explained that many probationers ' " 'violate probation and end up incarcerated as a result,' " ' often for violations that are technical in nature; that research shows probation services are most effective in the first 18 months, so ' " '[a] shorter term of probation, allowing for an increased emphasis on services, should lead to improved outcomes' " '; and that the bill's reduced probationary period was 'sufficient to fulfill the rehabilitative function of probation.' [Citation.] *Quinn* concluded, 'the only reasonable inference to draw from' this legislative history 'is that the shorter term of probation "now deemed to be sufficient should apply to every case to which it constitutionally could apply.' [Citation.] The alternative is untenable: that the [L]egislature intended to subject thousands of criminal defendants whose cases are not yet final to terms of probation determined to be unnecessary for rehabilitation, arguably discriminatory and likely to result in unfair and unnecessary reincarceration.' " (*Kuhnel*, *supra*, 75 Cal.App.5th at p. 733.)

Therefore, based on the above, defendant's probation terms should have been reduced to two years by AB 1950, and thus, should have initially ended on July 29, 2021, absent the time his probation was revoked. There were 278 days between February 20, 2020, and November 24, 2020, when defendant's probation was revoked. Therefore, the

maximum the trial court had authority to extend defendant's probation was for two years from July 30, 2019 (July 29, 2021), plus 278 days while probation was revoked. Hence, in the absence of another violation, defendant's probation should terminate on May 3, 2022, not November 24, 2022.

### 2. *NEW PENAL CODE SECTION 1465.9*

Effective July 1, 2021, Assembly Bill No. 1869 (2019-2020 Reg. Sess.) eliminated many fines, fees, and assessments that courts have imposed under a variety of statutes, including former section 1203.1b, which previously allowed collection of probation supervision fees. (Stats. 2020, ch. 92, § 47.) Any unpaid portion of the probation supervision fee ordered pursuant to former section 1203.1b is therefore uncollectable and unenforceable as of July 1, 2021. (§ 1465.9, subd. (a).)

In this case, at the time of sentencing, the trial court imposed fees for the presentence report and mandatory supervision. In our prior opinion, we applied section 1465.9, and struck the order for defendant to pay $727 for a presentence report and $29 a month for mandatory supervision. (*People v. Maljanian*, *supra*, E073573, at *10.) It is not clear whether the trial court ordered additional fees at the time of sentencing. Defendant, however, notes that the record refers to work-release and electronic-monitoring fees. Both defendant and the People agree that "[t]o the degree either of these fees was imposed by the court, or any of the other fees referenced in this court's January 12, 2022 order for supplemental briefing, the plain language of the newly enacted statutes dictates that any remaining unpaid balance of those fees as of July 1, 2021, is now

22

unenforceable, uncollectible, and the portion of the judgment imposing such costs must be vacated." We agree with the parties.

Therefore, we strike all fees that are not unenforceable and uncollectible under section 1465.9.

## DISPOSITION

The terms of defendant's probation are modified as provided *ante*; therefore, defendant's probation shall be terminated on May 3, 2022, in the absence of a new violation. Moreover, we hereby strike any unpaid balance for work-release fees and electronic-monitoring fees. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

McKINSTER

Acting P. J.

FIELDS

J.

23